UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

CLIFFORD M. HATLEY )
)
V. ) NO. 2:11-CV-45
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's application for Disability Insurance Benefits was denied following an administrative hearing before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 10 and 20].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human*

*Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff filed his claim for benefits in June, 2004. He alleged disability due to degenerative disc disease, arthritis, and herniated discs. (Tr. 51). He was 50 years of age on the date he was last insured, had a high school education, and past relevant work as a boiler maker which was skilled and heavy. On June 14, 2007, the plaintiff filed another application which was considered and denied by the ALJ in conjunction with the earlier application. In that application he also alleged mental impairments in addition to the physical impairments alleged in the 2004 application. (Tr. 993).

The plaintiff's original 2004 application was the subject of a prior proceeding in this Court which resulted in a remand of the case to the Commissioner for further adjudication. The earlier adjudication at the administrative level had the opinion of plaintiff's treating physician and of the consultatively examining psychologist opposed by no contrary reports from any examining sources, and without any medical expert testimony at the original administrative hearing. The case was remanded for further development and to give the Commissioner the opportunity to have further examinations of the plaintiff as to both his physical and mental status.

Plaintiff's mental health history is set forth in the Commissioner's brief as follows:

> In November 2004, consultative examining psychologist Wade Smith assessed Hatley as slight to moderately impaired in his concentration and pace due to his physical pain (Tr. 305). When Hatley's pain was greatest, Mr. Smith thought that he might be only capable of making simple decisions (Tr. 305). But Mr. Smith

Case 2:11-cv-00045-JRG-DHI   Document 22   Filed 01/11/12   Page 2 of 12   PageID #: 95

also opined that Hatley could adequately interact with others, adapt to changes in the workplace, recognize and take precautions against hazards, and generally comprehend and follow detailed job instructions (Tr. 305). Mr. Smith also diagnosed Hatley with depression and panic disorder (Tr. 305). Mr. Smith's report was cosigned by psychologist Dr. Diane Whitehead (Tr. 305).

One month later, in December 2004, state agency psychologist Dr. Warren Thompson opined that Hatley's mental impairments were not severe (Tr. 318). Dr. Thompson noted that Hatley's mental status exam with Mr. Smith was essentially normal (Tr. 318, citing Tr. 302). Also, although Hatley reported panicking in crowds, Hatley also said that he was able to drive, shop, and attend church (Tr. 318, referencing Tr. 304). Additionally, Dr. Thompson assessed Hatley as mildly limited in his activities of daily living, social functioning, and concentration, persistence, or pace, with no episodes of decompensation (Tr. 316).

In August 2007, consultative examining psychologist Dana Skaggs opined that because of depression, Hatley's ability to maintain persistence and concentration was highly impaired (Tr. 1098). Ms. Skaggs assessed Hatley as able to understand and put to use simple information or directions, but as having a marginal ability to comprehend and implement multi-step directions (Tr. 1098). However, she thought Hatley's social relationships were only mildly impaired (Tr. 1098).

One month later, in September 2007, state agency psychologist Dr. P. Jeffery White opined that Hatley could understand and remember simple and low level detailed tasks, interact appropriately with others, set limited goals, and adapt to infrequent change (Tr. 1124). He also believed that Hatley would have some (but not substantial) difficulty sustaining concentration and persistence for simple tasks (Tr. 1124). However, Hatley would be unable to sustain concentration, persistence, or pace for detailed tasks (Tr. 1124). Dr. White also assessed Hatley as having mild difficulties in maintaining social functioning and moderate limitations in activities of daily living and maintaining concentration, persistence, or pace, with no episodes of decompensation (Tr. 1118).

In February 2008, state agency psychological consultant Rebecca Joslin, Ed.D., opined that Hatley could understand and remember simple and detailed instructions (Tr. 1157). She also assessed Hatley as able (with some difficulty) to adapt to change, be around others without distraction, and maintain concentration, persistence, and pace (Tr. 1157). However, Dr. Joslin believed that Hatley was unable to interact appropriately with the general public (Tr. 1157). She also assessed Hatley as having mild limitations in his activities of daily living and moderate limitations in maintaining social functioning and concentration, persistence, or pace, with no episodes of decompensation (Tr. 1151).

In September 2008, Hatley visited the emergency room, complaining of a panic attack (Tr 800). A urine test was positive for opiates and benzodiazepine (Tr. 805). The attending physician then prescribed Xanax (a type of benzodiazepine) (Tr. 800).

Six days later, Hatley attended an intake mental health appointment, seeking treatment from a mental health specialist for the first time in the record (Tr. 835).

3

Three months later, Hatley had a psychiatric evaluation with Dr. G. Harold Naramore (Tr. 837-39). Hatley complained of panic attacks and mild to moderate depressive symptoms (Tr. 838). Hatley also said that "he has received Xanax or other benzodiazepine temporarily after presenting to ER with panic attack. Reports never trying any antidepressants or other psychotropic medications" (Tr. 837). Dr. Naramore prescribed an antidepressant and diagnosed Hatley with dysthymic disorder (a type of depression), generalized anxiety disorder, and rule out panic disorder and personality disorder (Tr. 838-39).

In the meantime, in October 2008, consultative examining psychologist Arthur Stair III, assessed Hatley as having mild restrictions on his ability to interact appropriately with others and no restrictions on his ability to understand, remember, and carry out instructions (Tr. 817-18). Mr. Stair also administered tests, one of which indicated that Hatley was engaging in symptom magnification (Tr. 813-14). Because of that test, Mr. Stair concluded that he "must assume that [Hatley] is exaggerating his symptoms to some degree. The objective data cannot be ignored" (Tr. 814). However, Mr. Stair did diagnose Hatley with depression and anxiety (Tr. 814).

At the second administrative hearing in February 2009, the ALJ asked psychological expert Dr. Thomas E. Schacht whether Hatley met or equaled any listed impairments, whether Hatley had any severe mental impairments that affected his work functioning, and whether there were any credibility issues that would need to be resolved by the ALJ (Tr. 1172). Dr. Schacht responded by discussing Hatley's medical history and problems with Hatley's credibility (Tr. 1172-77).

Dr. Schacht noted that Drs. Grindstaff and Slonaker treated Hatley at the same time (discussed below) (Tr. 1174). Yet, the record only contained pharmacy records of prescriptions given by Grindstaff (Tr. 1174). Dr. Schacht opined that the lack of records indicated that Hatley used another pharmacy to fill his prescriptions from Dr. Slonaker — a pharmacy which he did not disclose to the Social Security Administration (Tr. 1174). Dr. Schacht also observed that Hatley had a positive urine screen for Xanax at an emergency room visit in September 2008 (Tr. 1175, referencing Tr. 805). Dr. Schacht stated that the record did not show how Hatley obtained the Xanax that caused the positive urine screen (Tr. 1175). At a mental health appointment six days later, Hatley claimed that he had only started Xanax after being prescribed that drug at the emergency room visit (Tr. 1175, referencing Tr. 835). Similarly, Dr. Schacht stated that although Hatley's Xanax was not continued in his mental health treatment (*see* Tr. 838-39), Hatley reported to Dr. Purswani that he was still on Xanax (Tr. 1177). Dr. Schacht pointed out that improper or intermittent use of Xanax could cause withdrawal symptoms that mimic panic attacks (Tr. 1175). Dr. Schacht also testified that Hatley made contradictory statements to different examiners (Tr. 1173-74). He noted that Hatley told Mr. Smith that he had a pretty good childhood, without any abuse, while later telling Ms. Skaggs that he was severely abused from age four to adulthood (Tr. 1173-1174, referencing Tr. 302, 1094). In addition, Dr. Schacht noted that Mr. Stair's examination — the only consultative exam to test for malingering — raised concerns

4

that Hatley was exaggerating his symptoms (Tr. 1177, referencing Tr 814).

[Doc. 13, pgs. 4-8].

Plaintiff's history regarding his physical complaints is summarized in the Commissioner's brief as follows:

> Hatley had a history of back, hip, and leg pain since 1995 (Tr. 197). He was treated by Dr. Robert Grindstaff starting in 1998 (Tr. 142-199, 456-509, 528-557, 560-575, 1050-1091). Records show that internist Dr. Daniel Slonaker also treated Hatley starting in November 2003 (Tr. 738-776).
>
> Hatley was laid off in March 2003, for reasons unrelated to his physical condition (Tr. 243). In June 2003, Hatley had a series of scans (Tr. 200-04). The scans were unremarkable for his shoulders and knees (except for enthesophytes (tendon growths) in the knees) (Tr. 200-01). However, those scans showed stenosis (narrowing), herniation, and a bulge/protrusion in Hatley's cervical spine and a herniation causing significant stenosis in his lumbar spine (Tr. 202-04). By September 2003, Dr. Grindstaff diagnosed degenerative disc disease, lumbar stenosis, knee arthritis, hypertension, high cholesterol, and carpal tunnel syndrome (Tr. 180). He also put Hatley on opioid medications on a chronic basis (Tr. 176). That same month, another physician diagnosed Hatley as having a ruptured neck disc (Tr. 244). One month later, Hatley's neck and arm pain resolved with pain medication (Tr. 242). In February and March 2004, Dr. Grindstaff administered spinal blocks (Tr. 506-09).
>
> In August 2004, state agency physician Andrew H. Miller opined that Hatley could lift/carry 20 pounds occasionally and 10 pounds frequently (Tr. 291). He also thought that Hatley could both sit and stand/walk for six hours out or an eight-hour day (Tr. 291). Dr. Miller wrote that Hatley could occasionally balance and frequently engage in other postural activities (Tr. 292). He also restricted Hatley to no concentrated exposure to extreme cold or vibration (Tr. 294).
>
> In January 2006, Dr. Grindstaff opined that Hatley could lift/carry 10 pounds occasionally and no weight frequently (Tr. 456). He also wrote that Hatley could both sit and stand/walk for three hours out of an eight-hour day (but could only do so for one hour without interruption) (Tr. 456-57). Dr. Grindstaff further limited Hatley to only occasionally climbing, balancing, and kneeling, as well as never stooping, crouching, or crawling (Tr. 456-57). In addition, he noted that Hatley's bending, pushing, and pulling were affected by his impairments (Tr. 457).
>
> In August 2007, consultative examiner Dr. Marriane E. Filka assessed Hatley capable of lifting, pushing, and pulling up to 25 pounds on a regular basis (Tr. 1106). However, she restricted him to no work that required chronic neck flexion or repetitive stooping, squatting, climbing, or bending (Tr. 1106). Based upon her exam, Dr. Filka did not believe that any other restrictions were warranted (Tr. 1106).
>
> One month later, state agency physician Christopher W. Fletcher assessed

5

Hatley as able to lift/carry 50 pounds occasionally and 25 pounds frequently (Tr. 1127). Dr. Fletcher opined that Hatley could both sit and stand/walk for six hours out of an eight-hour day (Tr. 1127). He also wrote that Hatley could occasionally balance and frequently engage in other postural activities (Tr. 1128). Dr. Fletcher gave no further limitations (Tr. 1129-1130).

In September 2008, Dr. Dennis Aguirre examined Hatley, assessing him with fibromyalgia, "disabled in process," psycho-social dysfunction, inadequate information base, and degenerative disc disease in his cervical and lumbar spine (Tr. 782).

Three months later, consultative examiner Dr. Krish Purswani noted that Hatley's shoulders, elbows, and arms were normal (Tr. 822). Hatley had hypertrophy (tissue enlargement) in his knees, but normal range of motion and no tenderness, effusion (fluid buildup), or crepitus (cracking noises) (Tr. 822). Hatley's back was non-tender, but he had positive straight leg tests while standing and some limitations in his range of motion (Tr. 822). However, Hatley refused to conduct a straight leg test while sitting and refused to conduct gait testing, and toe and heel standing testing (Tr. 822). Dr. Purswani observed that Hatley's strength was four out five, with Hatley showing "poor effort" (Tr. 822). Hatley had normal reflexes (Tr. 822).

Dr. Purswani opined that Hatley could lift/carry 10 pounds occasionally, as well as walk for at least six hours per day, and sit and/or stand for longer (Tr. 824, 827). He also assessed Hatley as able to occasionally push/pull five pounds (Tr. 825). Dr. Purswani limited Hatley to never climbing ladders or scaffolds, and only occasionally stooping, kneeling, crouching, or crawling (Tr. 828-29).

Medical expert Dr. Theron Blickenstaff also testified at the hearing, opining that the objective evidence indicated that Hatley could lift 35 pounds occasionally and 15 pounds frequently (Tr. 1167-68). He opined that any other physical limitations would depend upon the credibility of Hatley's subjective complaints (Tr. 1168). Dr. Blickenstaff said that the objective evidence of abnormalities was inconsistent and that there was no convincing evidence of radiculopathy (radiating nerve pain) (Tr. 1167). But Dr. Blickenstaff stated that it was possible that Hatley had some degree of pain (Tr. 1169).

[Doc. 21, pgs. 8-11][1]

In his hearing of April 24, 2009, the ALJ noted that the plaintiff's insured status expired on December 31, 2008. Plaintiff had not engaged in substantial gainful activity from

---

[1]The Court would add to this summary that the plaintiff was treted by Dr. Steven C. Hamel, a neurosurgeon. In September, 1999, he noted an MRI showed "the same L5 disc that we have noticed all along. Plaintiff was also noted to have a ruptured disc at C5-6. Plaintiff did not desire surgery and was sent back to his primary care physician. (Tr. 244-45).

his alleged onset date, march 12, 2003, through that date. The ALJ found that the plaintiff had severe impairments of degenerative changes of the cervical, thoracic and lumbar spine, and mild degenerative changes of the knees. (Tr. 687).

The ALJ noted the physical findings of Dr. Hamel, Dr. Grindstaff, and others such as a lack of sensory deficit, no reports of atrophy, muscle wasting, deep tendon reflex deficit, sensory loss, motor loss, or loss of strength. (Tr. 688). He emphasized how these same traits were noted by Dr. Blickenstaff, and how the plaintiff had "refused to participate in a number of parts" of Dr. Purswani's consultative examination. He noted Dr. Blickenstaff's opinion regarding plaintiff's lifting capability, and the Doctor's opinion that "any other limitations would depend on the credibility" of the plaintiff's subjective complaints. (Tr. 689).

The ALJ then extensively discussed the various opinions and records regarding the plaintiff's alleged mental impairment. He recounted the hearing testimony of Dr. Schacht in great detail. (Tr. 689-91). He then found that the plaintiff's mental impairments do "not cause more than minimal limitation in the claimant's ability to perform basic mental work activities..." and were therefore not severe. (Tr. 691). He then addressed his findings with regard to the four functional areas utilized in evaluating mental disorders. Regarding activities of daily living, he found no limitations. In the area of social functioning, he found that the plaintiff had a mild limitation. Regarding the area of concentration, persistence and pace, he also found a mild limitation. Finally, with regard to episodes of decompensation, he found that plaintiff had experienced none of any extended duration. In each of these areas, he cited specific evidence which he relied upon to support his findings. He noted the lack of mental health treatment from any mental health professional until September of 2008.

7

He made frequent mention of the assessment of Mr. Stair. (Tr. 691-92). The ALJ found that his finding of no severe mental impairment was consistent with the State Agency psychologist (Tr. 306-319) and, more importantly from this Court's perspective, the opinion of Mr. Stair.

He then discussed the lack weight given to some of the mental and medical assessments. He found that the opinions of the State Agency consultants in Exhibits B-9F, B-14F and B-15F, along with the consultative exams of Skaggs and Smith, and found they had no probative value. This was because the "were rendered prior to recipt of evidence of inconsistent reporting with respect to use of potentially abusable substances, inconsistent statements by the claimant, and the..." opinion of Mr. Stair "reflecting concerns of exaggeration." (Tr. 693).

The ALJ then found that the plaintiff has the residual functional capacity ["RFC"] to perform the full range of light work. (Tr. 693). He then stated the plaintiff's subjective complaints were not credible to the extent they were inconsistent with this RFC. To support this finding, the ALJ again noted the statements of Dr. Blickenstaff regarding "inconsistent" findings of abnormalities, and the lack of convincing evidence of radiculopathy, muscle atrophy, reflex abnormalities or muscle weakness. He mentions that no treating source had opined that the plaintiff was "totally disabled due to pain."[2] (Tr. 694).

The ALJ then discussed the weight given to the assessments of Dr. Grindstaff and Purswani, stating that "to the extent that these indicate an inability to perform light exertion,

---

[2]However, the Court is unaware of any other reason for Dr. Grindstaff's severe restrictions on what the plaintiff can do other than that to do more would cause pain.

8

they are rejected for the reasons aforesaid. Further, the assessments are unsupported by clinical findings and imaging studies are not inconsistent with the record as a whole." [*sic*]. (Tr. 695).

He noted that he found plaintiff to have less lifting capability than that opined by Dr. Blickenstaff, and thus restricted him to full range of light work. (Tr. 695). Based upon Medical-Vocational Rule 202.21, he found that the plaintiff was not disabled. (Tr. 696).

Plaintiff argues that the ALJ did not comply with the order of remand "in any meaningful way." He asserts that the ALJ was ordered to obtain a consultative examination, that Dr. Purswani was that examiner, and that the ALJ then found him entitled to no weight. He asserts that the ALJ did not give proper weight to the opinion of Dr. Grindstaff, the treating physician. Since both Purswani and Grindstaff opined that the plaintiff had restrictions which would not allow a full range of light work, he asserts the use of the Grid was inappropriate. For this same reason, he says it was error for the ALJ not to use the available vocational expert. He asserts that the ALJ did not follow the procedures of the Administration by failing to qualify Dr. Blickenstaff pursuant to "HALLEX 1-2-6-70." Regarding the plaintiff's mental conditions, he states that there is no real dispute that the plaintiff has a mental impairment, and that only the degree of impairment is in question.

With respect to compliance with the Court's order, regarding the effects of the physical impairments on plaintiff's ability to work, there are two critical pieces of evidence which provide substantial evidence for the ALJ's RFC finding, only one of which he mentions to any real extent in his hearing decision. First, he now had in the record the consultative examination performed by Dr. Filka on August 23, 2007. She opined that the

9

plaintiff do "no lifting, pushing, pulling (of) more than 25 pounds on a repetitive basis." He should also be avoiding repetitive stooping, squatting, climbing or kneeling." Further, she stated he should do no work "at chronic neck flex position." (Tr. 1106). As stated by the Commissioner, Social Security Ruling 83-14, 1983 WL 31254 states that a restriction on stooping, crouching (akin to a squat), climbing and kneeling does not significantly affect the occupational base of light work. The restriction regarding avoiding a "chronic neck flex position" is another matter, but in all respects but this, her opinion is consistent with the ALJ's RFC finding.

This brings us to the second piece of evidence lacking in the first adjudication, the testimony of Dr. Blickenstaff. "Medical Experts" and non-examining State Agency physicians have been shown a significant amount of deference in 6th Circuit decisions over consultative physicians as in *Barker v. Shalala* 40 F.3d 789 (6th Cir. 1994), and *Ealy v. Commissioner of Soc. Sec.* 594 F.3d 504 (6th Cir. 2010), and even over treating physicians if prerequisites are met, as in *Combs v. Commissioner of Soc. Sec.,* 459 F.3d 640 (6th Cir. 2006), and *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994). Indeed, these cases suggest that if an ALJ points to a lack of objective findings, and a familiarity with the record on the part of the Medical Expert or State Agency source, they can provide substantial evidence. One could easily argue that such holdings contradict the preference for examining sources, and the extreme deference accorded to treating sources. However, that is the law in this Circuit, and this Court has no recourse but to follow it. Dr. Blickenstaff, supported by the very similar opinion of Dr. Filka, provide substantial evidence for the RFC. In the same vein, the ALJ adequately explained why he gave greater weight to Blickenstaff than

10

to Grindstaff and Purswani.

As for the argument that the ALJ did not properly validate the credentials of Dr. Blickenstaff or ask counsel if there was any objection to his testifying, this is at best a harmless error. Dr. Blickenstaff is a qualified, certified specialist in occupational medicine, and plaintiff's extremely competent counsel could have objected to the HALLEX procedure not being followed before Dr. Blickenstaff testified.

Also, the Court finds that the ALJ did not err, as finder of fact, in his determination regarding the plaintiff's credibility. He stated valid reasons, and pointed to evidence in the record from which he could make such a finding. It matters not that some other fact finder might have reached a different conclusion, or on any other issue provided substantial evidence supports the finding.

With respect to the finding that the plaintiff does not have a severe mental impairment, the ALJ placed great emphasis on the fact that no treatment was sought from a psychiatrist or psychologist until September of 2008. More importantly from a substantial evidence perspective, the opinion of Mr. Stair (Tr. 817-18) shows no more than a mild impairment in any area, with mild being defined as an ability "to generally function well." A mere diagnosis of depression or anxiety does not equate to a severe impairment, even under the *de minimis* standard. For example, on may have diabetes, a serious and potentially life threatening condition. However, if it is treatable and under good control, and does not cause a significant limitation on the ability to perform work-related activities, it is not a severe impairment.

In the final analysis, this is not an easy case. There is much evidence to support the

11

plaintiff's claim, perhaps more evidence than that he is not disabled. However, this Court has limited power in Social Security appeal cases. As stated in the preliminary language in every report and recommendation, if there is substantial evidence (which this Court cannot weigh or approach *de novo*) to support the ALJ findings, and if he does not commit any prejudicial errors in applying the law and regulations which deprives a plaintiff of "a substantial right," the Court must affirm his decision. There is substantial evidence and he has committed no reversible error. Accordingly, it is respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 10] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 20] be GRANTED.[3]

Respectfully submitted:

   s/ Dennis H. Inman
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).